**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| SHAWN MARIE MCLANE, |
| Plaintiff, |
| v. |
| DEB HAALAND, in her official capacity as Secretary of the Interior, |
| Defendant. |

Case No. 12-cv-1397 (CRC)

## MEMORANDUM OPINION

The National Park Service ("NPS") granted Plaintiff Shawn McLane's request to transfer from her job at Harper's Ferry National Historical Park after she was seriously assaulted by a co-worker. McLane accepted a new position on the National Mall in Washington, D.C. but refused to report to work on her appointed start date. Following several months of urging McLane to assume her duties, the agency removed her from service for "job abandonment."

McLane filed this suit in August 2012 against the Secretary of the Interior, who oversees NPS.[1] She claims that her removal violated federal civil service protections codified in Title V of the Code of Federal Regulations ("Title V"), as well as Title VII of the Civil Rights Act of 1964 ("Title VII") and the Rehabilitation Act. The case has had a long and rather complicated procedural history. For reasons the Court will explain later, McLane's various claims have been bifurcated. Currently before the Court are cross motions for partial summary judgment on McLane's challenge to a decision by a Merit Systems Protection Board Administrative Judge upholding her removal under Title V. Finding the Administrative Judge's decision to be

---

[1] The current Secretary, Deb Haaland, is automatically substituted as the defendant under Federal Rule of Civil Procedure 25(d).

supported by substantial evidence and otherwise in accordance with law, the Court will grant

summary judgment to the agency on McLane's Title V claim.

## I.    Factual Background

Plaintiff Shawn Marie McLane was employed as a Maintenance Office Assistant by the

National Park Service ("NPS" or "the agency") at the Harpers Ferry National Historical Park.

See A.R. Vol. 1 at 106.  In October 2010, McLane suffered a severe assault at the hands of a co-

worker.  Id. at 108.  Immediately following the assault, McLane received treatment for Post-

Traumatic Stress Disorder and depression from a psychiatrist, Dr. Allan L. Levy.  Id.  McLane

was on leave from her position at Harpers Ferry during this period.  See id. at 108, 110.  In

January 2011, Dr. Levy wrote a letter to McLane's supervisors stating that she would be able to

return to work but "should not return to her current employment location"——i.e. Harpers Ferry–

—because it would "trigger memories and emotions that would preclude effective workplace

function."  Id. at 108.  Dr. Levy opined that McLane should "only be placed in a work setting

more tha[n] 10 miles away from her current work, and the home of her assailant."  Id.

McLane echoed Dr. Levy in a series of emails to an NPS Human Resources official in

January 2011.  She asked the official to "[p]lease help me find a way to relocate," offering

"gladly [to] go anywhere but Harpers Ferry unless it would be possible to move to a locked

building."  Id. at 110.  McLane expressed concerns that she would be assaulted at Harpers Ferry

in part because some of her former co-workers were siding with her attacker.  See Pl.'s Opp. and

Reply Ex. 1 at 1.  McLane also feared that she "[could not] come back to" Harper's Ferry

because her attacker lived "a hop, skip and jump" from her office and had "threat[ened] to kill

[her]" while "know[ing] his way around the park."  Id. at 2.  "Being forced to return to" Harper's

Ferry, she worried, would be "very unsafe for not only myself but for other employees as well." Id. at 4. McLane emphasized that her doctor shared her concerns. Id.

In response to the concerns raised by McLane and Dr. Levy, the agency offered McLane two potential positions: one at the National Mall and Memorial Park ("NAMA") in Washington, D.C. and the other at the Museum Resource Center ("MRCE") in Landover, Maryland. A.R. Vol. 5. at 244–45. McLane complained that either position would require a significant commute and, in the case of MRCE, a move. Pl.'s Opp. and Reply Ex. 1 at 14. She noted that the commutes could "pose a problem . . . in attending necessary medical appointments," and requested "an opportunity to work" at a facility closer to her home. Id. No such positions were available, however. See Initial Decision, M.S.P.B. ECF 53-1 at 15 (citing affidavit of Charles Richardson, Supervisory Human Resources Office). McLane was ultimately assigned to NAMA. See A.R. Vol. 1. at 106 (notification of personnel action). Immediately after the assignment, McLane sent an email to HR noting that she was "glad she [got] to go to NAMA vs. MRCE" as NAMA "is the one I would have chosen," although she reiterated her reservations about the long commute. Id. McLane later emailed her new supervisor at NAMA, Justin Unger, to express her "appreciat[ion] of th[e] opportunity," adding that she was "really looking forward" to her new position. Id. at 103–04.

McLane was ultimately scheduled to start at NAMA on February 22, 2011. Id. at 101–02.[2] That morning, however, McLane emailed Unger stating that she was "unable to fulfill [her] obligations of working for National Mall . . . mainly due to the hardship it would impose upon

---

[2] At some point either contemporaneous with the offer or during the subsequent back and forth recounted below, the agency apparently offered McLane a transit and relocation subsidy to offset the additional expenses of her commute. ECF 53-1 at 20.

[her] as a result of the 65 miles (one way) commute." Id. at 101. She further indicated that she "lack[ed] the financial ability . . . to transport [herself]." Id. Unger initially responded that he would interpret McLane's email as a "declination" of the job at NAMA. Later that week, however, Unger sent McLane a "return to work" letter, instructing her to report for duty at NAMA. Id. at 93–95. McLane refused, stating that she was declining the position due to the long commute and its impact on her ability to attend medical appointments, the high cost of living in the D.C. area, and lack of security at NAMA. Id. at 91–92. McLane added that she felt she had been "[forced] to accept a relocation," and noted that Unger had originally treated her February 22, 2011 email as a "declination" of a job offer, rather than a refusal to show for work. Id. at 92. McLane noted in an email to HR the same day that she "assume[d], if it hasn't already happened, I will be terminated by the agency in the near future since I declined the only option, [that had] been given to [] continue my employment with DOI. What exactly is the process for removing an employee so I know what's to come[?]" Id. at 89–90.

McLane continued her correspondence with the agency while refusing to work at NAMA throughout the spring of 2011. In April, she wrote that she was "not sure what the agency's reasons are for holding on to me when it seems you have enough cause to remove me since you have put [me] on AWOL for over a month already" and noted that she could not "understand what [the agency's] rational[e] is in prolonging the inevitable." Id. at 78. She also indicated that she did "not want to be terminated" but instead to "be first given the option to resign." Id. at 77. She reiterated her frustration that the NAMA position would have made it "almost impossible to survive financially" and maintained that she had "wanted to return to [her] job at Harpers Ferry regardless of how others' outside the agency thought it was a bad idea." Id. at 77. She attributed

her previous willingness to work at NAMA to her fragile emotional state after being placed on

leave. Id. at 70–72.

On May 4, 2011, Unger again instructed McLane to report for duty at NAMA, warning

that "[i]f you fail to report for work as required, we will assume that your intention is to abandon

your position as an Administrative assistant" potentially resulting in "removal." Id. at 86.

McLane still did not report for duty at NAMA. Id. at 85. Accordingly, on May 19, 2011, the

agency sent McLane a letter terminating her employment due to job abandonment. Id. at 84.

The letter explained that NPS had determined that McLane had no intention to return to work

due to her persistent failure to report to NAMA starting in February 2011, and despite the two

return to work letters sent in March and May 2011. Id. A notice of removal followed on May

31, 2011. Id. at 63.

McLane responded to the May 19th removal letter in an email to HR in late May.

McLane insisted that she did "NOT wish to resign," requested union representation, and asked

why her request for a "reasonable accommodation" in the form of being relocated to a locked

building at Harpers Ferry had not been approved. Id. at 67.

## II. Procedural History

As noted above, this case has a long procedural history. In June 2011, McLane

challenged her termination through an appeal to the Merit Systems Protection Board ("MSPB").

Pl.'s Compl. ECF 1 ¶ 9. After an Administrative Judge ("AJ") dismissed the appeal, McLane

filed a petition for review with the full MSPB in October 2011. Id. at ¶¶ 9–11. The MSPB

affirmed the AJ's decision in April 2012 on the grounds that there had been a *de facto* settlement

between the parties which McLane could not rescind through MSPB proceedings. See id. at ¶

13. McLane sought review of the MSPB's ruling before the Equal Employment Opportunity Commission, but the Commission found that it lacked jurisdiction. Id. at ¶ 14–15.

McLane filed this suit in August 2012, challenging her removal under Title V of the Code of Federal Regulations, Title VII of the Civil Rights Act of 1964, and the Rehabilitation Act. See id. at 12–21. The case was assigned to then-District Judge Wilkins and the government moved to dismiss. See ECF 10. Judge Wilkins denied the motion to dismiss in March 2013, finding that there had been no settlement agreement and "therefore the Board's [April 2012] Final Order and administrative Initial Decision constituted legal error and were otherwise an abuse of discretion." ECF 27 at 1. After a brief period of mediation, McLane filed a consent motion to remand the case to the MSPB to decide the challenges to her removal in the first instance. In May 2013, Judge Wilkins remanded McLane's Title V claim to the Board and stayed McLane's Title VII and Rehabilitation Act claims while the remand was pending. Id. at 1-2. The parties proceeded to file periodic status reports regarding the progress of proceedings before the MSPB.

This Court received the case *in medias res*, as it were, following Judge Wilkins' elevation to the D.C. Circuit in 2014. The parties continued filing status reports until, in November 2016, a different MSPB Administrative Judge issued an initial decision dismissing McLane's claim. See ECF 53-1.

The AJ found that the MSPB lacked jurisdiction over McLane's claim because McLane had voluntarily abandoned her position. Id. at 23. After recounting the facts outlined above, the AJ explained that "abandonment of a position, like a resignation or retirement, is normally considered to be a voluntary action over which the Board lacks jurisdiction." Id. at 6. Nonetheless, she went on to observe that a request to "be restored to duty after being separated

6

for abandonment of position" should result in the agency restoring that employee to their position "unless it has proof of actual abandonment." Id. Because the agency removed McLane for abandonment, the AJ found that McLane bore the burden of demonstrating that she had either not abandoned her position or had not done so voluntarily. Id. The AJ ruled against McLane on both counts. See id. at 23.

As to abandonment, the AJ found it "undisputed that [McLane] initially accepted the position at NAMA and indicated her intent to report for duty." Id. at 15. Further, because McLane's doctor had strongly recommended that she be moved from Harpers Ferry, the AJ found that, apart from the NAMA and MRCE positions that the agency offered McLane, there were no other available positions in the area for which she was qualified. Id. at 18–19. The AJ noted that McLane had not provided any evidence to contradict the agency's representations that it had offered to provide her with relocation and transit subsidies to ease her transition. Id. at 20. While the AJ agreed with McLane that she had "indicate[d] to the agency that she wanted to work," she emphasized that McLane had never "indicate[d] that she would report to the position to which she was reassigned." Id. at 22. Thus, "[t]he fact that [McLane] was willing to report at some point to an ideal position [did] not mean that she ever intended to report to her assigned position of record." Id. As a result, the AJ concluded that McLane had failed to meet her burden to show that she had not abandoned her position. Id.

Moving to the voluntariness of McLane's abandonment of the NAMA position, the AJ acknowledged McLane's complaints regarding the long commute time from her home and her other issues with her position. Id. However, in light of the evidence that McLane had requested reassignment from her former work location, that her physician had required a relocation, and that there were no other positions on offer which met her doctor's requirements, the AJ

7

concluded that the "narrow" doctrine of "coercive involuntariness" did not apply. Id. at 22–23. The decision explained that even though the commute associated with the new position was unpleasant, a "reasonable person in [McLane's] position" would not have felt compelled to leave her position at NAMA. Id. at 23. McLane therefore "failed to prove by [a] preponderan[ce of] evidence" that the relocation "made her working conditions so intolerable that she had no choice but to leave her employment." Id.[3]

McLane timely appealed the AJ's decision to the full Board. What followed was a two-year period of inactivity by the Board due to a lack of the quorum necessary to decide McLane's appeal. In mid-2019, McLane asked the Court to permit her to withdraw her pending petition and proceed directly in the district court for review of her claims challenging her removal under Title V. See ECF 73. The Court granted this motion in July 2019 and set a schedule for briefing. See ECF 78. In December 2019, the parties requested, and the Court granted, another referral to mediation. See ECF 88; Minute Order of 12/12/2019. After the latest round of mediation failed, the parties requested that the Court set a briefing schedule for summary judgment on McLane's Title V claims only. Minute Order of 02/25/2020. These cross-motions are now ripe.

## III. Analysis

### A. Standard of Review

Although the cross-motions are limited to the question of whether McLane's removal complied with Title V, McLane's complaint also charges that she was removed because of both

---

[3] The AJ also held that McLane was not "disabled" and considered whether certain other accommodations requested by McLane were appropriately denied. See ECF 53-1 at 18, 20. Neither of these issues is presented in the instant motions.

discrimination and retaliation prohibited by Title VII and the Rehabilitation Act.  See Pl.'s

Compl.  These "mixed cases" typically implicate varying standards of review depending on

whether the Court is reviewing the MSPB's determination on the adverse employment action or

the MSPB's findings regarding the purportedly discriminatory reason for that action.  See Perry

v. Merit Sys. Prot. Bd., 137 S. Ct. 1975, 1980 (2017) (describing such "mixed case[s]").[4]

As for McLane's Title V challenge to her removal, "[t]he district court reviews [such]

claims on the administrative record, and will set aside the MSPB's determination only when

'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'; 'obtained

without procedures required by law, rule or regulation having been followed'; or 'unsupported

by substantial evidence.'"  Butler v. West, 164 F.3d 634, 639 n.10 (D.C. Cir. 1999) (quoting 5

U.S.C. § 7703(c)(1)–(3)).  Because the full Board never passed on the merits of McLane's

claims, the AJ's November 4, 2016 initial decision forms the basis of the Court's review.  This

review is "deferential[]," Fogg v. Ashcroft, 254 F.3d 103, 112 (D.C. Cir. 2001), and the

"defendant needs only to show that the decision has a 'rational basis in the law.'"  Hanna v.

Herman, 121 F. Supp. 2d 113, 121 (D.D.C. 2000) (quoting Wilder v. Prokop, 846 F.2d 613, 620

(10th Cir. 1988)).  The court may not "'re-weigh conflicting evidence'" as "agency conclusion[s]

may be supported by substantial evidence even though a plausible alternative interpretation of

the evidence would support a contrary view."  Rountree v. Johanns, 382 F. Supp. 2d 19, 32

(D.D.C. 2005) (quoting Bieber v. Dep't of Army, 287 F.3d 1358, 1364 (Fed. Cir. 2002) and

Robinson v. NTSB, 28 F.3d 210, 215 (D.C. Cir. 1994)).

---

[4] "Although [MSPB] decisions are generally reviewed by the Court of Appeals for the
Federal Circuit, 'mixed cases' that involve both MSPB appeals and discrimination claims," such
as McLane's, "are reviewed in federal district court[.]"  Vickers v. Powell, 493 F.3d 186, 192
(D.C. Cir. 2007).

The MSPB has limited jurisdiction extending to serious adverse actions, including

removals, taken by federal employers against certain federal employees. See 5 U.S.C. § 7512.

The Board generally will not have jurisdiction over the removal of an employee who voluntarily

abandoned or retired or resigned from their position. See Staats v. U.S. Postal Serv., 99 F.3d

1120, 1123–24 (Fed. Cir. 1996). As a corollary, "coerced" or "involuntary" abandonments,

resignations, or retirements are treated as removals falling under the Board's jurisdiction. See

Garcia v. Dep't of Homeland Sec., 437 F.3d 1322, 1329–30 (Fed. Cir. 2006). And, even if an

employee's abandonment, retirement, or resignation appears voluntary, the MSPB may have

jurisdiction where that "seemingly voluntary action[ ]" was, in fact, "'involuntary and thus

tantamount to forced removal,'" id. at 1328 (quoting Shoaf v. Dep't of Agric., 260 F.3d 1336,

1340–41 (Fed. Cir. 2001)), or where the employee's conduct simply did not amount to a

resignation, retirement, or abandonment at all, see Poschl v. United States, 206 Ct. Cl. 672, 688

(U.S. Cl. Ct. 1975). The employee bears the burden of proof as to both questions and is required

to show that she did not abandon her position (or did not do so voluntarily) by a preponderance

of evidence. See, e.g., Swaney v. Dep't of Army, 19 M.S.P.R. 440, 442 (M.S.P.B. 1984),

Freedman v. Veterans Admin., 23 M.S.P.R. 361, 364 (M.S.P.B. 1984). McLane challenges both

the fact of her abandonment and its voluntariness. She also argues that the manner of her

removal violated her Fifth Amendment right to due process. The Court will consider each issue

in turn.

    B.  Abandonment

    The MSPB has held that an agency may remove a federal employee for job abandonment

when the employee remains absent from work for an "extended period" of time and the agency

makes reasonable attempts to discern whether the employee intends to return to work, but the

employee either (a) cannot be reached by the agency or (b) expresses an intent not to return to their position. See, e.g., Poschl, 206 Ct. Cl. at 688–90. The Board has also indicated that, where the employee contacts the agency and requests reinstatement, the employee cannot be removed for abandonment and must be reinstated. See id. at 690 (quoting the former Federal Personnel Manual § 751, Subchapter 2, 2-1 for the proposition that "[a] nontemporary employee . . . who asks to be restored to duty after being separated in this way should be restored unless the agency has proof that he actually abandoned his position; otherwise, the Commission may find upon appeal that he did not abandon his position and order him to be restored.").

McLane refused to show up to her position at NAMA for three months following her February start date, which is an extended period of time. See A.R. Vol. 1 at 86, 101–02. The agency also made reasonable efforts to discern McLane's intentions via the two formal "return to work" letters and extensive email correspondence demanding her presence and laying out the consequences of continued absence. See, e.g., id. at 85–86, 93–94. Yet McLane steadfastly refused to report for duty at NAMA. If that were all, it would be a simple matter to affirm the AJ's determination that McLane abandoned her position at NAMA.

But the picture here is a bit more complicated. McLane points out that, despite her refusal to report for work at NAMA, she expressed a desire to return to work *in general*, and a willingness to assume a variety of different positions at non-NAMA locations, including back at Harpers Ferry if she could be placed in a locked building. See id. at 91–92. This willingness to accept other postings, she argues, forecloses any finding of abandonment and require the agency to reinstate her to employment. See Poschl, 206 Ct. Cl. at 690. Considering this argument, the AJ noted that McLane "at no time . . . indicate[d] that she would report to the position [at NAMA] to which she was reassigned" and held that "[t]he fact that [McClane] was willing to

11

report at some point to an ideal position does not mean that she ever intended to report to her assigned position of record." ECF 53-1 at 22. The Court agrees.

To begin with, the Court is aware of no MSPB decisional authority supporting McLane's reading of the abandonment standard as requiring reinstatement whenever an employee refuses to show up to work but indicates a willingness to report to some other position that she has not been assigned to or even offered. McLane's reading of the standard would provide an employee who has voluntarily left a particular job, but who is nonetheless willing to assume some other, more preferable, position, the same procedural protections as those removed involuntarily. That view is at odds with the text of the Civil Service Reform Act, which draws a distinction between voluntary action by an employee and actions taken by an employer against an employee's will (such as removal) for purposes of the MSPB's jurisdiction. See, e.g., Garcia, 437 F.3d at 1328–29 ("[n]othing in 5 U.S.C. § 7512, which enumerates specific adverse actions over which the Board has jurisdiction, extends the Board's jurisdiction to facially voluntary acts"). Further, the source of the abandonment doctrine, the former Federal Personnel Manual, notes that the inquiry is focused on the employee's intent to return to their "position." See, e.g., Swaney, 19 M.S.P.R. at 442–43 (noting that the Federal Personnel Manual "also provides that when an employee asks to be restored to duty after being separated in this manner, the agency should restore the employee unless it has proof of an actual abandonment of *position*." (emphasis added)); Tolentino v. Dep't of Treasury, 81 M.S.P.R. 258, 262–63 (M.S.P.B. 1999) (Vice Chair Slavet, dissenting) (citing the former Federal Personnel Manual for the proposition that "the question of the employee's intent is critical in determining whether there has been an abandonment of

*position*" (emphasis added)).[5]  The record here is clear that, following her February 2011

acceptance of the job at NAMA, McLane's "position" was "Administrative Support Assistant" *at

NAMA*, and, moreover, that McLane was aware of that fact.  See, e.g., A.R. Vol 1. at 106

("Notification of Personnel Action" form sent to McLane which records that her new "position"

was at NAMA).  The relevant "intent" under the abandonment doctrine is thus McLane's intent

to report for her position *at NAMA*.  Indeed, in announcing the applicable standard, McLane's

opening brief states that "[a] job abandonment occurs when an employee is absent from the

*workplace* for an 'extended period' of time," suggesting an even tighter focus on the specific

location of the employee's position.  Pl.'s MSJ at 5. (emphasis added).  As such, McLane's

willingness to report to some other position does not require the agency to reinstate her to a

position she continually refused to assume, nor does it defeat a finding of abandonment.[6]

    While the Court can conceive of situations where unduly strict attention to the "position"

requirement could present problems (for example, where an employee has no fixed workplace),

---

[5] The Federal Personnel Manual was "abolished on December 31, 1993, but the Board
has since repeatedly noted that it may still be relied upon in appropriate circumstances."  Belton
v. Dep't of Veterans Affairs, 2011 MSPB LEXIS 5342, *5 (2011) (citation omitted).  This has
caused at least one MSPB decision to question the abandonment doctrine's continuing viability.
See id.  Still, the Board in that case applied the doctrine and acknowledged that the end of the
Federal Personnel Manual did not, without further developments, abrogate the abandonment
doctrine in MSPB cases.  See id.  As such, and because both parties appear to agree that the
doctrine persists, see Pl.'s MSJ at 8 n.3; Def.'s MSJ at 6, the Court will apply it in this case.

[6] At points, McLane appears to argue that removal for abandonment is only appropriate
when the employee actually states something to the effect of "I have no intention to resume work
at my position" or is simply impossible to locate or contact.  See Pl.'s Opp. and Reply at 5–6.
But even if that were the proper standard, it would not be enough to salvage McLane's claim, as
she expressly refused to assume her position at NAMA.  Her willingness to work in other
positions or desire to remain generally employed is, as noted above, simply not sufficient
evidence to establish that she did not abandon her position at NAMA.

this is not one of them. McLane was employed in a position at a specific workplace where she was expected—and required—to report. See A.R. Vol 1. at 106. She nonetheless continually—and expressly—refused to show up to her position. The AJ thus did not err in finding that McLane's conduct amounted to abandonment and that the agency was not obliged to reinstate her, notwithstanding her desire to assume some other position.[7]

   C. Voluntariness

   McLane further argues that, even if the Court upholds the AJ's finding that she abandoned her position, the abandonment was not truly "voluntary." See, e.g., Pl.'s MSJ at 5. Such claims have a high bar, however, and the Court agrees with the AJ's determination that McLane did not surpass it here.

   In cases where an agency has removed an employee on the grounds that she voluntarily retired, resigned, or abandoned her position, the "abandonment of position . . . must be presumed to be voluntary . . . unless the [employee] presents sufficient evidence amounting to a preponderance, which establishes that the action was obtained through duress or coercion." Freedman, 23 M.S.P.R. at 364.[8] Put another way, the Board has held that it will assume

-------

[7] McLane also argues that the reasons for her refusal to work at NAMA---that the long commute would interfere with her medical treatment---prevents a finding that she possessed an intent to abandon her position. See Pl.'s Opp. and Reply at 21. The Court addresses, and rejects, this argument below in discussion of voluntariness. See supra § III.C.

[8] McLane argues that cases drawn from the resignation or retirement context are inapposite. However, the Board appears to treat resignations, retirements, and abandonments as examples of the broader category "voluntary actions outside the Board's purview" for purposes of this analysis. See Freedman, 23 M.S.P.R. at 364 ("[a]n abandonment of position, like a resignation or a retirement, must be presumed to be voluntary, and this presumption will prevail unless the appellant presents sufficient evidence amounting to a preponderance, which establishes that the action was obtained through duress or coercion."). McLane further points to a 2011 decision in which the MSPB stated that an employee's "assertion . . . that his absence was involuntary and that he had therefore not abandoned his position, indicates that the

14

jurisdiction in such cases only where the employee shows by a preponderance of the evidence

that their abandonment "was involuntary and thus tantamount to forced removal." See Staats, 99

F.3d at 1123–24. To make this showing, an employee must prove that the abandonment was

either (1) the "product of misinformation or deception by the agency" or (2) the "product of

coercion by the agency." Id. Because McLane (rightfully) does not contend that the agency lied

or otherwise misrepresented facts to encourage her to abandon her role, the Court focuses only

on coercion.

To overcome the presumption of voluntariness with a showing of agency coercion, "an

employee must show that the agency effectively imposed the terms of the employee's . . .

[abandonment], that the employee had no realistic alternative[,] . . . and that the employee's . . .

[action] was the result of improper acts by the agency." Id. The paradigmatic case of coercion is

a threat of disciplinary action which the agency "knows could not be substantiated." Id. And

"the proper test is an objective one" requiring the employee to "establish that a reasonable

employee confronted with the same circumstances would feel coerced into resigning." Garcia,

437 F.3d at 1329 (internal citations and quotation marks omitted).

The AJ's conclusion that the agency did not coerce McLane is supported by substantial

evidence. For starters, McLane's own statements at the time she interviewed for, was offered,

and was assigned to the position at NAMA evince a clear unwillingness to return to her position

at Harpers Ferry. See Pl.'s Opp. and Reply Ex. 1 at 1–2 (letter from McLane stating that she

---

[abandonment] doctrine is inapposite," Belton, 2011 MSPB LEXIS 5342 at *6 (citing Poschl,
206 Ct. Cl. at 672), as demonstrating a difference between the voluntariness inquiries. However,
this opinion did not deal with voluntariness but rather the reinstatement requirement discussed
and found inapplicable above. See supra § III.B.

"[could not] come back to" Harpers Ferry due to the proximity of her attacker). Indeed, McLane wrote that she was "glad [to] get to go to NAMA." A.R. Vol. 1 at 107. And Dr. Levy stated unequivocally that McLane should not continue work at Harpers Ferry and must be moved to a position at least 10 miles away. Id. at 108. Doing otherwise, he noted, would risk seriously endangering McLane's mental health. Id. The decision to transfer McLane from Harpers Ferry, then, was simply the natural outcome of both her request and the recommendation of her doctor. To be sure, McLane did express concerns regarding the commute to NAMA, see, e.g., id. at 107; A.R. Vol. 3 at 312, but she does not contest the agency's representation that, apart from those at MRCE and NAMA, there were no roles available that both matched her qualifications and satisfied Dr. Levy's criteria for maintaining her mental health. Nor does McLane dispute the AJ's finding that the agency offered her transit and relocation subsidies to ease her transition. See ECF 53-1 at 20. While there is no categorical rule preventing a finding of coercion in every case where the agency acted in line with the recommendation of an employee's doctor and the expressed desires of the employee, certainly the AJ did not err in finding such actions inconsistent with an allegation of coercion by NPS.

Nor, under the operative standards, was the AJ wrong to reject McLane's argument that the length of her commute to NAMA rendered the agency's insistence that she report for work coercive.[9] McLane argues that the commute impeded her access to necessary medical care and thus justified her continued refusal to work at NAMA. To be sure, long commutes are

_____

[9] Nothing the Court says here should be taken to express a view on the merits of McLane's Rehabilitation Act claim, which similarly alleges that the agency failed to accommodate her disability in the aftermath of the attack. The Court is narrowly concerned with reviewing the AJ's decision. That review is, as noted above, deferential and not conducted under the standards of the Rehabilitation Act.

unpleasant, but unpleasant experiences are not enough to establish coercion.  See Staats, 99 F.3d at 1124 (stating that "the fact that an employee is faced with an unpleasant situation or that his choice is limited to two unattractive options does not make the employee's decision any less voluntary").  Moreover, the record here is bereft of any evidence, outside McLane's own statements, that her commute would in fact interfere with her medical treatment.  On the other hand, there is ample record evidence supporting the view that relocating McLane from Harpers Ferry was medically appropriate.  As noted previously, Dr. Levy informed the agency that McLane "should only be placed in a work setting more than 10 miles away from [Harpers Ferry]" in order to avoid "trigger[ing] memories and emotions that would preclude effective workplace function."  A.R. Vol. 1. at 108.  McLane herself requested the transfer from Harpers Ferry, see Pl.'s Opp. and Reply Ex. 1 at 1–2, and indicated that NAMA "[was] the one I would have chosen" from the available options with full awareness of the commute required, see A.R. Vol. 1. at 107.  That those options may have been "unpleasant" does not render them coercive. See Staats, 99 F.3d at 1124.  And again, the agency offered measures, in the form of transit and relocation allowances, to mitigate the unattractiveness of the commute.  ECF 53-1 at 20. Particularly in light of the "deferential[]" review afforded to AJ decisions, Fogg, 254 F.3d at 112, and the admonition that courts may not "re-weigh conflicting evidence," Rountree, 382 F. Supp. 2d at 32 (internal quotation marks omitted), substantial evidence supported the AJ's determination that McLane failed to show coercion.

    D.  Due Process

       The Fifth Amendment guarantees that the government will not deprive citizens of any property without due process of law.  See U.S. Const. Amend. V.  "Property" in this context can include government employment.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532

(1985). McLane argues that the agency's decision to remove her from federal service without the full complement of pre-removal procedures present in the Civil Service Reform Act violated due process. See Pl.'s MSJ at 16. To prevail on this argument, however, McLane must show that she did not voluntarily abandon her position. See, e.g., Lawrence v. Acree, 665 F.2d 1319, 1325 (D.C. Cir. 1981) (holding that where the plaintiff had voluntarily quit his competitive government service position, "[t]here [was] no nexus between the [negative performance evaluation he received] and any deprivation of a property interest . . . his voluntary retirement breaks any nexus between the offending performance evaluation and damage to a constitutionally protected interest"); Kalme v. W. Virginia Bd. of Regents, 539 F.2d 1346, 1348–49 (4th Cir. 1976) ("The Fourteenth Amendment does not protect citizens against the voluntary, unilateral relinquishment of known rights . . . . By failing to appear for work pursuant to the terms of his [employment] agreement, [plaintiff] abandoned his rights under it."); Leheny v. City of Pittsburgh, 183 F.3d 220, 227 (3d Cir. 1999) ("If an employee retires of his own free will, even though prompted to do so by some action of his employer, he is deemed to have relinquished his property interest in his continued employment for the government, and cannot contend that he was deprived of his due process rights.").[10] As the Court has explained, the evidence here shows that McLane intended to, and did, abandon her position at NAMA. See supra §§ III.B, C. Her due process claim therefore fails.

McLane intimates that such a holding would place federal employees at risk of being removed with no process on grounds of "abandonment." But she does not contend that, if she did abandon her position, she was owed more process to challenge her removal than she was

---

[10] "The procedural due process protections under the Fifth and Fourteenth Amendments are the same[.]" English v. District of Columbia, 717 F.3d 968, 972 (D.C. Cir. 2013).

given here. A typical touchstone for "due process" is the proverbial "notice and opportunity for hearing appropriate to the nature of the case." See, e.g., Goss v. Lopez, 419 U.S. 565, 578 (1975) (internal quotation marks omitted). The facts of this case (and Board precedent) show that employees removed for abandonment are afforded such protections. Even before her removal, McLane was given repeated notice over the course of several months of the need to return to her position, as well as the consequences which would result from her continued refusal. See, e.g., A.R. Vol. 1 at 85–86, 93–94. And after her removal, in addition to being able to challenge the agency's action and finding of voluntary abandonment twice before Administrative Judges and the MSPB, McLane was able to bring the instant suit for judicial review of these decisions. See supra § II. Far from expanding to threaten civil service protections, abandonment is——and remains——a "narrow" doctrine, see Tolentino, 81 M.S.P.R. at 263 (Vice Chair Slavet, dissenting), which affords any employee removed for abandonment the ability to challenge that finding in an administrative proceeding, see Freedman, 23 M.S.P.R. at 364. Employees removed for abandonment are even entitled to an evidentiary hearing when the employee "has made non-frivolous allegations that, if true, would establish that she did not abandon her position." Id. In light of the advance notice and post-removal process available to McLane in this case, the agency did not violate due process by removing her from service.

IV.    Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Partial Summary Judgment. A separate Order shall accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  6/21/2021