UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SHAWN MARIE MCLANE**, <br><br> Plaintiff, <br><br> v. <br><br> **DEB HAALAND**, in her official capacity as Secretary of the Interior, <br><br> Defendant. | Case No. 12-cv-1397 (CRC) |

## OPINION AND ORDER

Plaintiff Shawn Marie McLane moves for reconsideration of the Court's June 2021 Memorandum Opinion and accompanying Order granting Defendant Deb Haaland's motion for partial summary judgment. In that ruling, the Court affirmed the decision of a Merit Systems Protection Board Administrative Judge upholding McLane's removal from her job with the National Park Service ("NPS") and concluded the termination did not violate the civil service protections codified in Title V of the Code of Federal Regulations. McLane now contends that reconsideration of this ruling is warranted under Federal Rule of Civil Procedure 54(b) because, in her view, the Court misapprehended both the factual record and the law governing her Title V claim. In the alternative, she asks the Court to certify its order under either Rule 54(b) or 28 U.S.C. § 1292(b) for immediate appeal. For the reasons below, the Court will deny both requests.

### I.   Background

Because the Court assumes familiarity with its summary judgment opinion, it only briefly recounts the facts necessary for understanding the current motion.

McLane worked as a Maintenance Office Assistant at NPS's Harpers Ferry National Historical Park until October 2010, when she suffered a severe assault at the hands of a coworker with whom she was in a personal relationship. See A.R. Vol. 1 at 106, 108, ECF No. 86-1.[1] In the aftermath of the attack, McLane sought treatment for Post-Traumatic Stress Disorder and depression and took leave from her job. See id. at 108, 110. In January 2011, as she prepared to return to work, McLane requested a new placement more than ten miles from her current workplace and her attacker's home, claiming that returning to work at Harpers Ferry risked worsening her PTSD symptoms. See Ex 1. to Pl.'s Summ. J. Opp'n & Reply at 4, ECF No. 97-3 (email of Jan. 18, 2011, explaining that return to Harpers Ferry would bring "reminder" of past threats, increasing symptoms and preventing her from working); id. at 1–2, 10 (repeatedly asking supervisor for relocation or transfer, including to temporary position near the Gulf of Mexico). In other communications with NPS's Human Resources department, McLane suggested that placement in a locked building at Harpers Ferry might also be an appropriate accommodation. See A.R. Vol. 1 at 110 (email of Jan. 27, 2011); see also id. at 107 (email of Feb. 10, 2011, raising same possibility). However, even after proposing a return to her old job, McLane submitted a letter from her treating physician reiterating her need for relocation. See id. at 108–09 (Jan. 28, 2011, doctor's letter).

In response, NPS found two open positions elsewhere in the Capital Region, and helped McLane secure employment at one—the National Mall and Memorial Park ("NAMA") in Washington, D.C. See A.R. Vol. 5 at 244–45, ECF No. 86-5. Despite expressing concerns that the commute to NAMA would make it difficult to "attend[] necessary medical appointments and

---

[1] Because the volumes of the Administrative Record do not contain page numbers, the Court adopts the numbering of each ECF filing, and refers to those files as separate "volumes."

counseling," McLane accepted the position on February 10, 2011. Ex 1. to Pl. Summ. J. Opp'n & Reply at 14; A.R. Vol. 1 at 107.

Yet, McLane did not show up to work on her first day, February 22, 2011. She instead sent an email to her new supervisor, informing him that she was "unable to fulfill [her] obligations" at NAMA due to the "hardships" the long and expensive commute "would impose." A.R. Vol. 1 at 95–96. In that email, McLane did not mention her PTSD or depression, nor any need to attend medical appointments or counseling. See id. Over the next several months, McLane sporadically responded to the agency's repeated requests for her to return to work. See, e.g., id. at 93–94 (Feb. 22 return to work letter); id. at 89–92 (Mar. 1, 2011, emails from McLane to supervisor and HR); id. at 69–81 (April 1–3 emails from McLane to HR); id. at 86 (May 4, 2011, return to work email). Only once that spring did McLane reiterate her complaint that the new position at NAMA would interfere with her medical and mental health treatment. See id. at 91 (raising concern in March 1, 2011, email to NAMA supervisor). In a series of emails to NPS HR Specialist Marlene Doty in early April, McLane suggested that NPS "pressure[d]" her to accept a "non-local reassignment," and that she had in fact "wanted to return to [her] job at Harpers Ferry." Id. at 71–72. She acknowledged, however, that "others[] outside the agency"— presumably including her doctor—"thought it was a bad idea." Id. at 72. And she promptly asked Doty to disregard and "delete" the emails where she mentioned wanting to return to Harpers Ferry. Id. at 69–70.

The following month, on May 19, 2011, the agency terminated McLane from her position at NAMA based on her unapproved absence and failure to respond to two return-to-work letters. See id. at 82–84. Two weeks later, McLane emailed Doty about her termination, explaining that she did not wish to resign. See id. at 67. In those emails, McLane asked why the agency had

"den[ied]" her "requests for reasonable accommodations," including to return to work in a locked building at Harpers Ferry.  Id. at 66.

McLane challenged her termination through an appeal to the Merits System Protection Board ("MSPB").  After a complex procedural history, an Administrative Judge ("AJ") found the MSPB lacked jurisdiction over McLane's claim because she had voluntarily abandoned her position.  See MSPB Op. at 23, ECF No. 53-1; see also MSJ Op. at 5–8 (describing procedural history).  The Court upheld that determination in its partial summary judgment order.

## II. Analysis

The Court has carefully considered the plaintiff's motion and finds that it does not meet the standard for either reconsideration under Rule 54(b) or certification for immediate appeal under any relevant standard.  The Court does so largely for the reasons laid out in its partial summary judgment opinion.  However, the Court will briefly address the merits of two arguments McLane raises.  The first concerns whether McLane ever expressed an intention to return to her position—whether at NAMA or Harpers Ferry.  Substantial evidence supports the AJ's finding that she did not.  The second argument relates to the interaction between McLane's Title V claim and the agency's obligations under the Rehabilitation Act.  Because she did not fully flesh out that second legal argument until her reconsideration briefing, the Court did not address it head-on in the earlier opinion.  As explained below, McLane's argument cannot succeed under the deferential standard of review given to the agency in the Title V context.  For those reasons, the Court will deny the request for reconsideration.  And because McLane's new argument underscores the interrelated nature of her Title V and still-pending disability discrimination claims, the Court will also deny her request to certify the issue for appeal.

A.  Reconsideration

McLane first moves under Rule 54(b) for reconsideration of the order granting summary judgment to the agency on her Title V claim.  Rule 54(b) applies to any order that "adjudicates fewer than all the claims" in a case, and provides that such an order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b).  This Rule recognizes the Court's "inherent power to reconsider an interlocutory order as justice requires."  Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc., 630 F.3d 217, 227 (D.C. Cir. 2011) (internal quotation marks omitted).  Generally, courts interpret this "abstract phrase narrowly and will grant a motion to reconsider only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order."  King & Spalding, LLP v. U.S. Dep't of Health & Human Servs., 395 F. Supp. 3d 116, 119–20 (D.D.C. 2019) (internal quotation marks omitted).  McLane only contends that the opinion constituted "clear error."  Recons. Mot. at 2, ECF No. 108.  The Court finds no such error.

Central here is the "deferential[]" standard of review that applies to McLane's Title V claim, which arises on appeal of an administrative determination by an MSPB AJ.  See Fogg v. Ashcroft, 254 F.3d 103, 112 (D.C. Cir. 2001).  The Court reviews this claim "on the administrative record, and will set aside the MSPB's determination only when 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'; 'obtained without procedures required by law, rule or regulation having been followed'; or 'unsupported by substantial evidence.'"  Butler v. West, 164 F.3d 634, 639 n.10 (D.C. Cir. 1999) (quoting 5 U.S.C. § 7703(c)(1)–(3)).

As explained in the partial summary judgment opinion, and contrary to McLane's claims now, the AJ's conclusion that the MSPB lacked jurisdiction because McLane had "voluntarily abandoned" her position is supported by substantial evidence and otherwise accords with law. The Court sees no error in those determinations. Likewise unavailing is McLane's renewed due process claim, see Recons. Mot. at 6–8, which the Court again has already addressed. Below, the Court expands only on the two most substantial arguments in McLane's reconsideration briefing.

The Court first rejects McLane's recycled assertions that she had manifested an intent to return to her position, triggering the agency's obligation to reinstate her. See id. at 4–6. As the Court has already concluded, the record supports the AJ's finding that McLane's "position" at the time of her abandonment was as an Administrative Support Assistant *at NAMA*, and she never reported any willingness to report to work there after she accepted the position. See MSJ Op. at 12–14; A.R. Vol. 1 at 106 (form noting reassignment). In particular, the Court finds sufficient evidence to undermine McLane's claims that her reassignment was involuntary, and that she really wanted to remain at Harpers Ferry. See MSPB Op. at 16 (rejecting similar arguments). Prior to accepting the NAMA position in February, McLane did once raise the possibility of placement in a locked facility at Harpers Ferry. See A.R. Vol. 1 at 110. This suggestion, however, was contrary to all her other communications during this period. Over the course of several weeks, McLane told her supervisor and other NPS officials that she felt "very unsafe" at Harpers Ferry, that returning there would trigger her PTSD symptoms and interfere with her work, and that her doctor had instructed her to relocate. See Ex. 1 to Pl.'s Summ. J. Opp'n & Reply at 1–2, 4; A.R. Vol. 1 at 108–09. McLane did express concerns about commuting to NAMA and suggest other positions closer to her home (all of which, the record indicates, were not available). See Ex. 1 to Pl.'s Summ. J. Opp'n & Reply at 14–15; A.R. Vol. 1

at 107. But she ultimately accepted the NAMA position, and has pointed to no evidence that she expressed any intent to report to that job.

The only other possible position McLane could have held at the time of her dismissal was her old one at Harpers Ferry, but the record again contains substantial evidence that she never expressed a clear intent to report there either. After she failed to report for work at NAMA, McLane again brought up the possibility of returning to Harpers Ferry. But these expressions were as contradictory and equivocal as the prior one. On February 10—shortly after accepting the reassignment to NAMA—McLane wondered in an email to Doty, the HR Specialist, why NPS "couldn't just accommodate [her] need for safety" in a locked building at Harpers Ferry. A.R. Vol. 1 at 107. The next day, however, McLane wrote to her new supervisor to request an unpublished email address because she was worried about Harpers Ferry employees knowing her whereabouts. A.R. Vol. 1 at 104. That request is obviously at odds with any suggestion that McLane would have willingly returned to Harpers Ferry, where she could have been observed directly by her former colleagues. Next, as part of a series of emails that McLane sent to Doty between April 1 and 3, McLane stated that she "wanted to return to [her] job at Harpers Ferry regardless of how others[] outside the agency"—including her doctor, presumably—"thought it was a bad idea." A.R. Vol. 1 at 71. At the end of the chain, however, she asked Doty to disregard and "immediately delete" the entire series of emails. Id. at 69–70. Finally, after her removal from service, McLane asked Doty why the agency had not honored her requests for "reasonable accommodations" at Harpers Ferry, including in a locked building. Id. at 66. But, as explained above, McLane's requests at the time were far from clear. Moreover, nothing in the record indicates that McLane ever withdrew her doctor's letter or that he altered his recommendation that she not return to Harpers Ferry.

All that is left, then, is McLane's claim that she wanted to return to *some* job with NPS. See Recons. Mot. at 4–5 (citing Jan. 21, 2011 email to Harpers Ferry supervisor indicating desire to "keep" her job, Ex. 1 to Pl.'s Summ. J. Opp'n & Reply at 2); see also A.R. Vol. 1 at 67 (stating in May 31, 2011, email only that she does not "wish to resign"). But as the Court has explained, McLane could not avoid a finding of abandonment with a stated desire only to keep working generally, or to assume some position she did not hold. See MSJ Op. at 13–14; see also MSPB Op. at 22.

That brings the Court to McLane's second argument, which she has hinted at before but only takes up with full force in her reconsideration motion, and particularly in her reply brief. Now, McLane asserts that her rejection of the NAMA position served as notice to NPS that the reassignment was not an effective accommodation, and that, by telling NPS she wanted to keep "her job," she had requested alternate accommodations. Given this, McLane contends, NPS's obligation under the federal Rehabilitation Act to help her find an appropriate accommodation precluded the AJ's finding that she had voluntary abandoned her position. See Recons. Mot. at 3–4; Pl.'s Reply at 5–8. The Court rejects this argument, too.

The Court begins with a brief overview of the two relevant areas of law. The first concerns the MSPB's jurisdiction over challenges to removal actions by federal employees. The MSPB generally does not have jurisdiction over the removal of employees who voluntarily abandon, retire, or resign from their position. See Staats v. U.S. Postal Serv., 99 F.3d 1120, 1123–24 (Fed. Cir. 1996). But "coerced" or "involuntary" abandonments, resignations, or retirements are instead treated as removals falling under the Board's jurisdiction. See Garcia v. Dep't of Homeland Sec., 437 F.3d 1322, 1328–29 (Fed. Cir. 2006).

8

The second area of law is the Rehabilitation Act, which governs employee claims of disability discrimination against the federal government. Ward v. McDonald, 762 F.3d 24, 28 (D.C. Cir. 2014). The "basic tenet" of the Rehabilitation Act "is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result." Id. (explaining that Act incorporates standards from Americans with Disabilities Act). Recognizing that "[f]ew disabilities are amenable to one-size-fits-all accommodations," the Act and related regulations generally require agencies "to initiate an informal, interactive process with the individual with a disability in need of the accommodation." Id. at 31–32. Because this process is an interactive one, an employer's duty "is not exhausted by one effort" at accommodation and continues "where the employer is aware that the initial accommodation is failing and further accommodation is needed." Pappas v. District of Columbia, 513 F. Supp. 3d 64, 93 (D.D.C. 2021) (internal citation and quotation marks omitted). Still, "failure to provide [the plaintiff] with exactly the accommodation she requested is not, in and of itself, evidence that the [defendant] did not engage in good faith in the interactive process." Morris v. Jackson, 994 F. Supp. 2d 38, 49 (D.D.C. 2013). An employer is "liable *only* if it bears responsibility for the breakdown of the interactive process," Alston v. Washington Metro. Area Transit Auth., 571 F. Supp. 2d 77, 86 (D.D.C. 2008)—because it "ended" the back and forth or participated "in bad faith," Ward, 762 F.3d at 32.

McLane now seeks to tie these two bodies of law together. She contends that she had an open request for accommodation, that the agency failed to participate in the interactive process, and that these facts preclude a finding that her absence constituted voluntary abandonment. See Pl.'s Reply at 5–8. The Court notes that McLane did not make this express legal argument until her reply in support of her reconsideration motion. Although she earlier raised concerns about

9

whether reassignment to NAMA was an effective accommodation, McLane never drew the Court's attention to the potential interactions between these two legal regimes.  See, e.g., Pl.'s Summ. J. Opp'n & Reply at 8 (claiming she had sought new accommodation but suggesting that Court need not decide "whether Defendant's conduct ran afoul of the Rehabilitation Act").  Even now, it is unclear how, precisely, McLane believes these two areas of law fit together.  The cases she cites go only to the agency's obligations under the Rehabilitation Act itself; they do not stand for the proposition that an agency's failure to engage in the "interactive process" or otherwise respond to an accommodation request, as required by that Act, would automatically preclude a finding of voluntary abandonment of position for the purposes of Title V.  See Pl's Reply at 7 (citing, e.g., Edwards v. EPA, 456 F. Supp. 2d 72, 100 (D.D.C. 2006) (outlining standard for effective accommodation under Rehabilitation Act); Husain v. Barsa, No. 15-cv-708, 2021 WL 663206, at *18 (D.D.C. Feb. 19, 2021) (same)).  The Court has not independently found any cases stating as much.  But, as explained below, even if McLane is right about the interaction between these two legal regimes, the Court rejects her request for reconsideration under the deferential standard of review it must apply to the AJ's factual findings.

In the decision on review, the AJ carefully considered and rejected McLane's contentions "that she did not report to her assigned position because the agency failed to accommodate her disabling condition."  MSPB Op. at 16; see generally id. at 16–20.  To the contrary, in the AJ's view, "it appear[ed] that the agency ma[de] substantial efforts to assist her."  Id. at 21.  The AJ's findings comport with the relevant standards under the Rehabilitation Act and are supported by

substantial evidence in the record.[2]  The Court is thus bound to affirm them under the deferential standard applied to review of McLane's Title V claim.[3]

To begin, the Court defers to the AJ's reasonable choice to treat the entire back and forth between McLane and NPS—from her initial request for a new placement in January up through her post-termination correspondence in May—as part of the same "flexible give-and-take between employer and employee" to determine the appropriate and available accommodations. Ward, 762 F.3d at 32.  For this reason, the Court rejects McLane's suggestion that the concerns she raised about the commute to NAMA "*triggered* Defendant's duty to engage in the interactive process under the Rehabilitation Act." Pl.'s Reply at 10 (emphasis added) (internal quotation marks omitted).  The AJ found that duty was already triggered when McLane first asked for relocation, so she understandably chose not to focus on the parties' later interactions in isolation.

And when considered holistically, the record supports the AJ's findings that NPS made substantial efforts to find McLane an effective accommodation.  First, as the Court has already explained, there is substantial evidence to support the AJ's finding that throughout January 2011, McLane repeatedly asked to be relocated away from Harpers Ferry—including to as far away as the Gulf Coast. See supra at 6; MSPB Op. at 16.  These requests support the AJ's rejection of McLane's claim that her reassignment was involuntary. See A.R. Vol. 1 at 65, 70–71.  The

---

[2]  To be sure, the AJ did not couch her holdings in the exact terms laid out in the Rehabilitation Act.  That is understandable, as the question of NPS's liability under that statute was not—as it is not here—under direct review.  The AJ's factual findings, however, still answer the relevant questions about whether NPS satisfied any obligation it might have had to help McLane find an accommodation for her disability.

[3] This holding is not necessarily dispositive of McLane's still-pending Rehabilitation Act claim in this Court.  On the merits of that claim, the Court may not be confined to the record that was before the agency, and will not apply such a deferential standard of review, which could lead to a different outcome.

11

Court similarly defers to the AJ's finding that McLane's initial rejection of the NAMA job was not due to any need for heightened security or access to medical or mental health providers. See MSPB Op. at 19–21. As the AJ noted, McLane never raised concerns about security when she interviewed at NAMA or in the weeks after. Id. at 19; see also A.R. Vol. 1 at 91, 95–96. And while McLane first suggested that the commute to NAMA would interfere with her medical and mental health treatment in early February, she accepted the placement the very next day. Ex 1. to Pl.'s Summ. J. Opp'n & Reply at 14, 16. This behavior suggests McLane did not, at the time, believe the NAMA reassignment to be an ineffective accommodation. If McLane was indeed unhappy in mid-February 2011, the administrative record does not indicate that she made "reasonable efforts to help the other party determine what specific accommodations [we]re necessary," Ward, 762 F.3d at 32, as the Rehabilitation Act requires.

Over the following months, McLane's communications to NPS do not always make clear that she was unhappy with the NAMA placement *because* it was an ineffective accommodation. In the email McLane sent to her NAMA supervisor explaining her first-day absence, she did not mention her mental or physical health, need to attend treatment, or wish for alternative accommodation. See A.R. Vol. 1 at 95–96. McLane later raised concerns about her ability to seek treatment and support to her NAMA supervisor, but she never did the same with her designated contact in NPS HR. Compare id. at 91–92 (Mar. 1, 2011 email to Justin Unger) with id. at 89–90 (Mar. 1, 2011 email to Marlene Doty). Indeed, the one time McLane even arguably mentioned those concerns to Doty, she quickly asked the HR specialist to disregard and immediately "delete" the email chain. See id. at 69–70, 77–78. At the same time, McLane continued to tell Doty that her Harpers Ferry supervisor had mistreated her following her attack, and that she worried that she would run into her former colleagues at Harpers Ferry. Id. at 72–

73, 75–76. Neither of those concerns would be addressed by reassignment to a locked building on the campus.

To the extent McLane did eventually make clear that she believed her reassignment to NAMA was an ineffective accommodation, the record still supports the AJ's findings that the alternatives she then suggested were either inappropriate or unavailable. The Court must defer to these record-based findings, and in this context they doom McLane's claim that NPS failed to meet its obligation to try to accommodate her. See Alston, 571 F. Supp. 2d at 82 (placing burden on employee raising Rehabilitation Act claim to show "that a reasonable accommodation was possible").[4] As the AJ pointed out, and the Court has already explained, McLane's occasional suggestions that the agency should have considered placing her in a locked building at Harpers Ferry is undermined by her separate communications to NPS that such a move would *not* satisfy her accommodation request. See MPSB Op. at 18–19; supra at 6. The record similarly supports the AJ's findings that the agency made reasonable efforts to find McLane a new placement outside of Harpers Ferry, and to mitigate the downsides of the NAMA placement once it became clear that was the only option. The AJ cited uncontested evidence in the record that NPS searched for and helped McLane secure the only position in the region that was vacant and for which she was qualified—the job at NAMA. MSPB Op. at 17–18 (citing sworn statement of

---

[4] This principle is consistent with a related area of MSPB jurisdictional case law—on retirements due to disability—where the existence of an effective accommodation likewise plays a dispositive role. As with abandonments, the MSPB does not have jurisdiction over any claim arising out of a voluntary disability retirement, but would have jurisdiction if the decision to take disability retirement was in fact involuntary, due to the agency's failure to accommodate. See Cothron-Mallett v. MSPB, 590 F. App'x 967, 971 (Fed. Cir. 2014). But in that case, too, the burden is on the employee to "show that there was an accommodation available on the date of her separation that would have allowed her to continue her employment, and that the agency did not provide her that accommodation." Id. (cleaned up) (quoting Benavidez v. Dep't of Navy, 241 F.3d 1370, 1375 (Fed. Cir. 2001)).

Human Resources supervisor). As the AJ also noted, NPS offered both a transit subsidy and relocation expenses to address McLane's most prominent concern with the NAMA job. Id. at 20. These efforts were sufficient to ground a finding that the agency met its obligations under the Rehabilitation Act, which does not require an employer to reassign an employee to a vacant position where one does not exist. Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1305 (D.C. Cir. 1998).

Because the AJ's findings are supported by substantial evidence, and because they undermine McLane's suggestion that NPS failed to work in good faith to accommodate her, the Court must defer to the AJ's conclusion that the agency did not cause her absence. The Court thus rejects McLane's request for reconsideration of its voluntary-abandonment holding.

B. Certification

In the alternative, McLane asks the Court to certify her Title V claim for immediate appeal, under either Rule 54(b) or 28 U.S.C. § 1292(b). The Court declines both requests.

Rule 54(b) governs circumstances, like this one, where "an action presents more than one claim for relief." Fed. R. Civ. P. 54(b). The Rule allows a court to "direct entry of a final judgment" as to less than all the claims in the case if the Court finds "'there is no just reason for delay' in entering an appealable order as to some of" them. Blue v. D.C. Pub. Schs., 764 F.3d 11, 15 (D.C. Cir. 2014) (quoting Fed. R. Civ. P. 54(b)). In determining whether there are reasons for delay, courts "employ[] a list of five relevant factors that were originally set out in Allis–Chalmers Corp. v. Phila. Elec. Co., 521 F.2d 360 (3d Cir. 1975)," which are:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay,

>economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Sci. & Com. Sys. Corp., 249 F. Supp. 3d 130, 133 (D.D.C. 2017).

And under 28 U.S.C. § 1292(b), "a district court may certify an order for interlocutory appeal when '(1) the order involves a controlling question of law; (2) a substantial ground for difference of opinion concerning the ruling exists; and (3) an immediate appeal would materially advance the litigation.'" Azima v. RAK Inv. Auth., 325 F. Supp. 3d 30, 34 (D.D.C. 2018) (internal quotation marks omitted).  The certification decision is left to the discretion of the district court, and "[t]he party seeking interlocutory review has the burden of persuading the Court that the circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." APCC Servs., Inc. v. Sprint Commc'ns Co., L.P., 297 F. Supp. 2d 90, 95 (D.D.C. 2003) (internal quotation marks omitted).

Under both provisions, then, district courts can sanction immediate appeal of an otherwise non-final order only when doing so would enhance, and not detract from, the advancement of the litigation.  The issues laid out in this reconsideration order make clear that immediate appeal would not conserve judicial or party resources.  In particular, the analysis above demonstrates that McLane's Title V and Rehabilitation Act claims not only rest on many of the same facts, but also require the Court to confront potentially interrelated legal questions about the two areas of law.  As a result, the Title V claim may not be truly "separable from the others remaining to be adjudicated," and there is substantial risk that an "appellate court would have to decide the same issues more than once," should there be "subsequent appeals." Bldg. Indus. Ass'n of Superior Cal. v. Babbitt, 161 F.3d 740, 744 (D.C. Cir. 1998) (quoting Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8 (1980)).  That is sufficient to deny certification

15

under Rule 54(b).  <u>See</u> <u>id.</u>  The same concerns about judicial economy similarly undermine any case for certification under § 1292(b).  <u>See</u> <u>APCC Servs.</u>, 297 F. Supp. 2d at 100.

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [108] Plaintiff's Motion for Reconsideration or Certification is DENIED.  It is further

**ORDERED** that the parties shall file a Joint Status Report within 14 days proposing a plan for further proceedings in this case.

**SO ORDERED**.

 

CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>March 15, 2022</u>